IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| SHAQUILLE PARKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:17-CV-753-KFP |
| | ) | (WO) |
| | ) | |
| WARDEN MIKE HENLINE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

## I.    INTRODUCTION[1]

This 42 U.S.C. § 1983 action is pending before the Court on a Complaint filed on

November 6, 2017, by Shaquille Parker, a pretrial detainee held at the Elmore County Jail

August 21–22, 2017. In the Complaint, Parker alleges that he was subjected to excessive

force by Defendants on August 21, 2017, after he tried to escape. He also challenges the

conditions of his confinement, namely that he was deprived of a mat and blanket, was in

handcuffs and shackles, and was forced to use the bathroom in "a hole in the floor" for the

two days he was held at the jail. Doc. 1 at 5–10. The named defendants are Sheriff Bill

Franklin and Elmore County Jail Warden Mike Henline. Doc. 1 at 2. Parker does not state

whether he sues Defendants in their official or individual capacities. He seeks money

---

[1] All documents and attendant page numbers are those assigned by the Clerk of Court in the docketing
process.

damages and "want[s] the officers who did this to be fired." Doc. 1 at 4. However, he fails to name as defendants any of the officers who allegedly violated his constitutional rights.

The parties consented to the jurisdiction of a United States Magistrate Judge for all proceedings, including entry of a final judgment, pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. Doc. 18. Thereafter, Defendants filed a special report, including relevant evidentiary materials, and denied subjecting Parker to unconstitutional conditions or using excessive force against him. Doc. 23.

Defendants also raise the defense of exhaustion in their special report. Doc. 23 at 10–12. The Prison Litigation Reform Act ("PLRA") requires that "inmates complaining about prison conditions exhaust prison grievance remedies before initiating a lawsuit." *Jones v. Bock,* 549 U.S. 199, 202 (2007). Thus, Defendants argue that Parker's claims are barred because he failed to use the grievance procedure in place at the Elmore County Jail. Doc. 23 at 12.

After reviewing the special reports and exhibits, the Court issued an Order requiring Parker to respond with affidavits or statements made under penalty of perjury and other evidentiary materials. Doc. 24. This Order specifically cautioned that, "**unless within ten (10) days from the date of this order a party** . . . **presents sufficient legal cause why such action should not be undertaken** . . . the court may at any time [after expiration of the time for Plaintiff filing a response to this order] and **without further notice to the parties** (1) treat the special report and any supporting evidentiary materials as a motion for summary judgment and (2) after considering any response as allowed by this order, rule on the motion for summary judgment in accordance with the law." Doc. 24 at 3. Parker filed

a response to this Order. *See* Docs. 25 and 26. Pursuant to the Order, the Court now treats Defendants' special report as a motion to dismiss with respect to the failure to exhaust claims and as a motion for summary judgment as to any remaining claims, and the Court concludes that judgment is due to be granted in favor of Defendants.

## II.    STANDARD OF REVIEW

Because the Court deems it appropriate to treat Defendants' special report as a motion to dismiss with respect to the exhaustion defense, the case is now pending on that motion. *Bryant v. Rich*, 530 F.3d 1368, 1374–75 (11th Cir. 2008) (internal quotations omitted) ("[A]n exhaustion [defense] . . . is not ordinarily the proper subject for a summary judgment [motion]; instead, it should be raised in a motion to dismiss, or be treated as such if raised in a motion for summary judgment."); *Trias v. Fla. Dep't of Corr.*, 587 F. App'x 531, 534 (11th Cir. 2014) (holding that the district court properly construed Defendant's "motion for summary judgment as a motion to dismiss for failure to exhaust administrative remedies"). However, to the extent the Court concludes that Plaintiff has properly exhausted his administrative remedies as to any claim, the Court will address the merits of those claims on summary judgment.

Under Rule 56 of the Federal Rules of Civil Procedure, a reviewing court must "grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material*

3

fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–248 (1986). "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson*, 477 U.S. at 248). "An issue is 'material' if it might affect the outcome of the case under the governing law." *Id.*

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Id.* at 322–23.

Once the movant has satisfied this burden, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. In doing so, and to avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents,

electronically stored information, affidavits or declarations, stipulations[], admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B).

If the nonmovant "fails to properly address another party's assertion of fact as required by Rule 56(c)," then the court may "consider the fact undisputed for purposes of the motion" and "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2)–(3). In determining whether a genuine issue for trial exists, the court must view all the evidence in a light most favorable to the nonmovant. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998–99 (11th Cir. 1992) (internal citations and quotations omitted). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (citation omitted). Furthermore, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990); *see also Anderson*, 477 U.S. at 249–50 ("If the evidence [on

which the nonmoving party relies] is merely colorable, or is not significantly probative, summary judgment may be granted.") (internal citations omitted).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and pro se complaints are entitled to liberal interpretation, a pro se litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *Beard v. Banks,* 548 U.S. 521, 525 (2006); *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, Parker's pro se status does not mandate a disregard of elementary principles of production and proof in a civil case.

After a thorough and extensive review of all evidence, the Court finds that Parker has failed to exhaust his administrative remedies on all of his claims and that this action could be dismissed solely on that basis alone. Indeed, the evidence shows that Parker never filed a grievance concerning excessive force or unconstitutional conditions. *See* Doc. 23 at Exs. 1–10. The Court further finds, as an alternative basis of dismissal, that Parker has failed to demonstrate a genuine dispute of material fact on his claims.

## III.   STATEMENT OF FACTS

Parker alleges that Sheriff Franklin and Warden Henline subjected him to excessive force after he escaped from the Elmore County Jail by exiting the front door and running "threw [sic] the sally port, out the garage doors, threw [sic] the parking lot, and out to a open field." Doc. 1 at 5. He claims an unnamed sheriff pursued him in a vehicle and while running away he fell into a "waiting creek" and then climbed over a fallen tree. At this point he alleges that he was too tired to run farther, "so [he] laid down and surrendered." Doc. 1 at 5–6. He further maintains that, even though he did not resist, the sheriff tased

him repeatedly and other officers "start[ed] beating on me, kicking me, stomping me, and punching me. They did that repeatedly about six times." Doc. 1 at 6. He alleges that, after he was pulled to his feet, "[s]ome big white guy in an Alabama hat grabbed me and drug me across the creek water, and said 'this is what you get for running.' Then other officers proceeded to make me climb up the hill, with cuffs behind my back. Every time I fell they would punch me or tase me and make me get back up." *Id*.

Parker goes on to allege that, after returning to the jail, "[he] was drug out the car by an officer, threw [sic] the entrance door into booking and into a bathroom in the booking area . . . [where] A white officer who [sic] name I don't know, took off my handcuffs, and punched me in the face and sent me falling to the floor. Then other officers jumped in and began beating on me . . . I was so tired and exhausted and in need of medical attention, I couldn't fight back. I just balled up in the floor to try to protect myself. They beat on me for about 5 minutes." Doc. 1 at 7.

Next, he claims he was taken to a "padded cell" where he was beaten again and then left on the floor where he "began throwing up and I also blacked out a couple of times." Doc. 1 at 8. While in this cell, he alleges that he "urinated on [himself] a couple of times because there was no toilet, just a hole in the floor." *Id*. He alleges that on August 22, 2017, the officers placed a drunk man in the "padded cell" with him and gave the man a mat and a blanket but refused to provide him with the same. He complains that the drunk man should not have been placed in the cell with him because there is "only suppose to be one person, in the suicide padded cell at one time." *Id*. Finally, he states that on August 23,

2017, he was returned to St. Clair prison, where holes were discovered on his back from being tased when he was taken to the infirmary for a body chart. Doc. 1 at 9.

Defendants each deny the allegations of Parker's Complaint and affirmatively state, "I have not acted or caused anyone to act in any way so as to deprive Mr. Parker of any right to which he was entitled during his incarceration in the Elmore County Jail." Doc. 23-1 at 2, Doc. 23-2 at 2. Sheriff Franklin further testified: "I did not personally see our officers capture Mr. Parker; however, I was standing outside as he was being escorted back to our facility. To the best of my knowledge and belief, Mr. Parker did not appear to have been injured in anyway. It was apparent that Mr. Parker was tired from running; however, our officers were also tired from pursing Mr. Parker during his attempted escape. Additionally, I did not see anyone use any type of physical force upon Mr. Parker after being detained." Doc. 23-1 at 3. Warden Henline testified similarly. Doc. 23-2 at 3.

With respect to the capture of Parker, Elmore County Sheriff's Department Lieutenant David Slay, who is not a defendant in this action, testified as follows:

> In regards to Mr. Parker's allegations stated within his complaint, on August 21, 2017, Mr. Parker was transported from the St. Clair Correctional Facility to the Elmore County Jail to appear before the court for pending criminal charges.
>
> On this day, I was actually on patrol and sitting in my patrol vehicle when I noticed Mr. Parker sprinting across the Jail's parking lot.
>
> I immediately notified our officers on my radio of the situation and began following Mr. Parker in my vehicle until I reached a wooded area.
>
> There, I jumped out of my patrol vehicle and began a foot pursuit of Mr. Parker.
>
> I noticed that Sgt. Matthew Eller was also pursuing Mr. Parker on foot; however, Sgt. Eller slipped and fell to the ground.

I did not have time to check on Sgt. Eller and continued pursuing Mr. Parker on foot.

While running through the wooded area, we reached a steep drop-off area that led into the bottom of a creek bed.

The entire time during this pursuit, I was informing Mr. Parker: "Sheriff's Department; stop running"; however, Mr. Parker failed to comply and continued running.

Mr. Parker was able to get across the creek and crawled in between some trees that had fallen.

I noticed Mr. Parker attempting to climb up an embankment that was surrounded by some trees.

I continued to inform Mr. Parker to stop running, but he still would not comply. At this point, I pulled out my Taser and shot Mr. Parker in the back.

I could tell that the Taser prongs made contact; however, some of the prongs had dislodged from Mr. Parker, making them ineffective.

At that time, Mr. Parker began to climb back up the embankment, so I shot Mr. Parker a second time with different prongs attached.

During this time, I was able to make my way through the fallen trees, but once again, Mr. Parker began attempting to climb up the embankment after the Taser cycle had ended.

I was finally able to reach Mr. Parker and attempted to place handcuffs on him; however, Mr. Parker began elbowing me and was doing everything that he could possibly do to resist.

At that time, I issued another Taser cycle through the prongs to Mr. Parker and informed him to quit resisting.

Mr. Parker was lying on one his hands and would not place it behind his back, so I issued another Taser cycle through the prongs to Mr. Parker again.

By this time, both of us were extremely exhausted and I was finally able to handcuff Mr. Parker.

> After handcuffing Mr. Parker, Sgt. Eller arrived on scene and I informed him that Mr. Parker was in custody. I then asked Sgt. Eller to stay with me until other officers arrived so Mr. Parker could be escorted back up the hill.
>
> Soon after, other officers arrived and were able to escort Mr. Parker back to a patrol vehicle and transported him back to the Jail.
>
> After handing Mr. Parker off to the other officers, I did not have any further interaction with Mr. Parker.
>
> It took me a while to get back up the hill because I was absolutely exhausted, and by the time I got back to the top, the officers had already left with Mr. Parker.
>
> During this entire incident, I used the minimal amount of force that was necessary to detain Mr. Parker.
>
> To the best of my knowledge and belief, Mr. Parker did not appear to have been injured in anyway. It was apparent that Mr. Parker was tired from running; however, all of the officers involved were tired from pursuing Mr. Parker during his attempted escape.

Doc. 23-4 at 2–5. Elmore County Sheriff's Department Sergeant Matthew Eller, who is also not a defendant in this action, confirmed that he heard Lieutenant Slay repeatedly tell Mr. Parker to stop running and that Mr. Parker did not appear to have been injured in anyway during his capture. Moreover, he stated that he "did not see anyone use any type of physical force upon Mr. Parker after being detained." Doc. 23-3 at 3–4.

With respect to the grievance process at Elmore County Jail, Warden Henline testified:

> Inmate grievances are to be made in writing within the Elmore County Jail. An inmate with a grievance may request a grievance form from any member of the jail staff. The staff member shall provide one copy of the grievance form to the inmate and take it back from the inmate after a reasonable amount of time has elapsed for the inmate to complete the form. Grievances may be filed on a request form as well. All grievances must be filed within fourteen days of the incident complained of.

> If an inmate is unsatisfied with the response to their written or oral grievance, they may appeal the decision.
>
> . . .
>
> After reviewing Mr. Parker's Jail file, it appears that he did not file any inmate request slips or grievance forms in regards to any of the specific allegations stated within his Complaint.

Doc. 23-2 at 3–5. Parker does not allege that he attempted to use the grievance process by requesting a form or by making an oral complaint. Rather, he asks the Court to assume, based on his placement in a padded cell with shackles and handcuffs, that Defendants would have refused any request for "a grievance form and a pen." Doc. 25 at 4.

## IV.   DISCUSSION

### A.   EXHAUSTION

In addressing the requirements of 42 U.S.C. § 1997e as to the defense of exhaustion, the Eleventh Circuit has recognized:

> "[t]he plain language of th[is] statute makes exhaustion a precondition to filing an action in federal court." *Higginbottom v. Carter*, 223 F.3d 1259, 1261 (11th Cir. 2000) (per curiam) (quoting *Freeman v. Francis*, 196 F.3d 641, 643–44 (6th Cir. 1999)). This means that "until such administrative remedies as are available are exhausted," a prisoner is precluded from filing suit in federal court. *See id.* (affirming dismissal of prisoner's civil rights suit for failure to satisfy the mandatory exhaustion requirements of the PLRA); *Harris v. Garner*, 190 F.3d 1279, 1286 (11th Cir. 1999) ("reaffirm[ing] that section 1997e(a) imposes a mandatory requirement on prisoners seeking judicial relief to exhaust their administrative remedies" before filing suit in federal court), *modified on other grounds*, 216 F.3d 970 (11th Cir. 2000) (en banc); *Miller v. Tanner*, 196 F.3d 1190, 1193 (11th Cir. 1999) (holding that under the PLRA's amendments to § 1997e(a), "[a]n inmate incarcerated in a state prison ... must first comply with the grievance procedures established by the state department of corrections before filing a federal lawsuit under section 1983."); *Harper v. Jenkin*, 179 F.3d 1311, 1312 (11th Cir. 1999) (per curiam) (affirming dismissal of prisoner's civil suit for failure to satisfy

> the mandatory exhaustion requirements of § 1997e(a)); *Alexander v. Hawk*, 159 F.3d 1321, 1328 (11th Cir. 1998) (affirming dismissal of prisoner's *Bivens* action under § 1997e(a) for failure to exhaust administrative remedies prior to filing suit in federal court).

*Leal v. Georgia Dep't of Corr.*, 254 F.3d 1276, 1279 (11th Cir. 2001). Furthermore, the law is well-settled that "the question of exhaustion under the PLRA [is] a threshold matter that [federal courts must] address before considering the merits of the case. Because exhaustion is mandated by the statute, [a federal court has] no discretion to waive this requirement." *Myles v. Miami-Dade Cty. Corr. & Rehab. Dep't*, 476 F. App'x 364, 366 (11th Cir. 2012) (internal quotation marks omitted) (citing *Chandler v. Crosby*, 379 F.3d 1278, 1286 (11th Cir. 2004) and *Alexander*, 159 F.3d at 1325–26). Therefore, the Court will resolve this issue first.

"When deciding whether a prisoner has exhausted his remedies, the court should first consider the plaintiff's and the defendants' versions of the facts and, if they conflict, take the plaintiff's version as true. If in that light, the defendant is entitled to have a complaint dismissed for failure to exhaust administrative remedies, it must be dismissed. If the complaint is not subject to dismissal at this step, then the court should make specific findings in order to resolve the disputed factual issues related to exhaustion." *Myles*, 476 F. App'x at 366 (internal quotation marks omitted) (citing *Turner v. Burnside,* 541 F.3d 1077, 1082 (11th Cir. 2008)). Consequently, a district court "may resolve disputed factual issues where necessary to the disposition of a motion to dismiss for failure to exhaust [without a hearing]. The judge properly may consider facts outside of the pleadings to resolve a factual dispute as to exhaustion where doing so does not decide the merits, and

the parties have a sufficient opportunity to develop the record." *Trias*, 587 F. App'x at 535 (internal citations omitted). The Eleventh Circuit specifically rejected the argument that "disputed facts as to exhaustion should be decided by a jury [or other factfinder]." *Id*.

Upon review of the Complaint, Defendants' special report with undisputed evidentiary materials, and Plaintiff's response to the report, the Court concludes that Defendants' motion to dismiss is due to be granted. It is undisputed that the Elmore County Jail had a grievance policy in place during the two days that Plaintiff was in custody and that he made no attempt to use the grievance process. Doc. 23-2 at 3–4. Parker makes no allegation that he attempted to use the process by requesting a form or by making an oral grievance or that Defendants in any way denied him access to the process. Rather, he asks the Court to assume that he would have been denied access if he had attempted to use the process. Doc. 25 at 4. Plaintiff's failure to initiate the grievance process mandates dismissal of his claims. *Leal,* 254 F.3d at 1279. The Court could dismiss this action based solely on Plaintiff's failure to exhaust; however, out of an abundance of caution and as an alternative basis for dismissal, the Court will address the merits of Plaintiff's Eighth Amendment excessive force and conditions claims.

## B.    ABSOLUTE IMMUNITY

To the extent Parker requests monetary damages from Defendants in their official capacities, they are entitled to absolute immunity. Official capacity lawsuits are "in all respects other than name . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). As the Eleventh Circuit has held:

> [T]he Eleventh Amendment prohibits federal courts from entertaining suits by private parties against States and their agencies [or employees]. There are two exceptions to this prohibition: where the state has waived its immunity or where Congress has abrogated that immunity. A State's consent to suit must be unequivocally expressed in the text of [a] relevant statute. Waiver may not be implied. Likewise, Congress' intent to abrogate the States' immunity from suit must be obvious from a clear legislative statement.

*Selensky v. Alabama*, 619 F. App'x 846, 848–49 (11th Cir. 2015) (internal quotation marks and citations omitted). Thus, a state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity or Congress has abrogated the state's immunity. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 59 (1996).

> Neither waiver nor abrogation applies here. The Alabama Constitution states that "the State of Alabama shall never be made a defendant in any court of law or equity." Ala. Const. Art. I, § 14. The Supreme Court has recognized that this prohibits Alabama from waiving its immunity from suit.

*Selensky*, 619 F. App'x at 849 (citing *Alabama v. Pugh,* 438 U.S. 781, 782 (1978)). "Alabama has not waived its Eleventh Amendment immunity in § 1983 cases, nor has Congress abated it." *Holmes v. Hale*, 701 F. App'x 751, 753 (11th Cir. 2017) (citing *Carr v. City of Florence, Ala.*, 916 F.2d 1521, 1525 (11th Cir. 1990)); *see also Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1277 (11th Cir. 1998) (holding that state officials sued in their official capacities are protected under the Eleventh Amendment from suit for damages); *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1524 (11th Cir. 1995) (holding that damages are unavailable from state official sued in his official capacity). Thus, Defendants are entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities.

### C.    RESPONDEAT SUPERIOR

The Court will now address Plaintiff's claims brought against Defendants in their individual capacities. Plaintiff makes no allegations that Sheriff Franklin or Warden Hemline used excessive force against him or personally took any actions that subjected him to unconstitutional conditions while he was in the Elmore County Jail on August 21–22, 2107. He does not specifically identify any officers who participated in the conduct about which he complains. To the extent Plaintiff alleges that Sheriff Franklin and Warden Hemline are liable to him in their supervisory positions based on a theory of respondeat superior, those claims fail, as the law is well established that supervisory officials cannot be held liable in § 1983 actions under any theory of respondeat superior or vicarious liability. *See Belcher v. City of Foley, Ala.*, 30 F.3d 1390, 1396–97 (11th Cir. 1994).

"Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) ("[S]upervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability."); *Marsh v. Butler Cty., Ala.*, 268 F.3d 1014, 1035 (11th Cir. 2001) (holding that a supervisory official "can have no respondeat superior liability for a section 1983 claim."); *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (concluding supervisory officials are not liable on the basis of respondeat superior or vicarious liability); *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (citing *Belcher*, 30 F.3d at 1396, and stating that 42 U.S.C. § 1983 does not allow a plaintiff to hold supervisory officials

liable for the actions of their subordinates under either a theory of respondeat superior or vicarious liability). "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677. Thus, liability for the alleged excessive force and unconstitutional conditions could attach to Sheriff Franklin and Warden Henline only if they "personally participate[d] in the alleged unconstitutional conduct or [if] there is a causal connection between [their] actions . . . and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360.

A causal connection may be established when (1) "a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so," when (2) "a supervisor's custom or policy . . . result[s] in deliberate indifference to constitutional rights," or when (3) "facts support an inference that the supervisor directed the subordinate to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Id.* (citations omitted). Plaintiff has alleged no facts that would establish a causal connection. Doc. 1 at 5–9. Thus, the Court concludes that Plaintiff's claims against Sheriff Franklin and Warden Hemline fail.

### D.   EXCESSIVE FORCE

As an additional basis for dismissal, the Court will examine the claims against the unidentified subordinates whom Plaintiff has failed to name as defendants. Parker claims that Officer Slay,[2] who is not a defendant in this action, continued to use force against him

---

[2] Although Parker does not specifically identify Officer Slay in his Complaint as the officer who pursued and apprehended him, it is apparent from the factual statements included in Officer Slay's Affidavit that he is this officer. Doc. 23-4 at 2–5, Moreover, Officer Eller, another officer at the jail when Plaintiff escaped, confirms that Officer Slay pursued and apprehended Plaintiff. Doc. 23-3 at 2–4.

after he surrendered by repeatedly tasing and punching him. However, it is undisputed that Plaintiff ignored Officer Slay's repeated orders to stop while Plaintiff was running away from the jail. Doc. 1 at 5–8, Doc. 23-3 at 3–4, Doc. 23-4 at 2–5. Furthermore, Plaintiff claims that other unidentified officers punched and kicked him while he was handcuffed and walking back to the jail, and that they continued this abuse even after he was in the jail.

Claims of excessive force by prison officials against convicted inmates are governed by the Eighth Amendment's proscription against cruel and unusual punishment. *Campbell v. Sikes*, 169 F.3d 1353, 1374 (11th Cir. 1999). "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson v. McMillian*, 503 U.S. 1, 9–10 (1992) (internal quotations and citations omitted). "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'" *Sims v. Artuz*, 230 F.3d 14, 22 (2nd Cir. 2000) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).

The standard applied to an Eighth Amendment excessive force claim contains both a subjective and objective component. *Hudson*, 503 U.S. at 8. The subjective component requires that prison "officials act[ed] with a sufficiently culpable state of mind." *Id*. (internal quotations omitted). To establish the subjective element, a plaintiff must demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Sims*, 230 F.3d at 21. To establish the objective component, a plaintiff must

show that "the alleged wrongdoing was objectively harmful enough to establish a constitutional violation." *Hudson*, 503 U.S. at 8. In addition, "the use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury." *Id*. at 4. "Injury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010).

Summarizing the excessive force standard in the prison context, the Eleventh Circuit wrote:

> Under the Eighth Amendment, force is deemed legitimate in a custodial setting as long as it is applied "in a good faith effort to maintain or restore discipline [and not] maliciously and sadistically to cause harm." *Whitley v. Albers*, 475 U.S. 312, 320–21, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2nd Cir.1973)); *see also Hudson v. McMillian*, 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992. To determine if an application of force was applied maliciously and sadistically to cause harm, a variety of factors are considered including: "the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Hudson*, 503 U.S. at 7–8, 112 S.Ct. 995; *see also Whitley*, 475 U.S. at 321, 106 S.Ct. 1078; *Harris v. Chapman*, 97 F.3d 499, 505 (11th Cir. 1996). From consideration of such factors, "inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley*, 475 U.S. at 321, 106 S.Ct. 1078 (quoting *Johnson*, 481 F.2d at 1033).

*Skrtich v. Thornton*, 280 F.3d 1295, 1300–1301 (11th Cir. 2002). Recently, the Eleventh Circuit applied the *Whitley* factors in a § 1983 action brought by a pro se prisoner for injuries he received during the inspection of his cell after he failed to follow an order from defendant prison officers. *Miles v. Jackson,* 757 F. App'x. 828 (11th Cir. 2018). The court identified the five factors relevant in determining whether force was applied maliciously or sadistically: (1) the need for the application of force, (2) the relationship between that need and the amount of force used, (3) the threat reasonably perceived by the responsible officials, (4) any efforts made to temper the severity of the use of a forceful response, and (5) the absence of serious injury. *Id.* at 829 (internal quotations omitted) (citing *Hudson,* 503 U.S at 7, in turn quoting *Whitley,* 475 U.S. at 321).

Moreover, the Eleventh Circuit has stated that "[w]hen evaluating whether the force used was excessive, we give broad deference to prison officials acting to preserve discipline and security." *Pearson v. Taylor*, 665 F. App'x 858, 863 (11th Cir. 2016) (citing *Bennett v. Parker*, 898 F.2d 1530, 1533 (11th Cir. 1990)); *Hudson*, 503 U.S. at 7 (holding that courts are to "give a wide range of deference to prison officials acting to preserve discipline and security"). In addition, the determination "must not be made in the glow of hindsight." *Griffin v. Troy State Univ.,* 128 F. App'x 739, 742 (11th Cir. 2005) (citation omitted). "Prison guards may use force when necessary to restore order and need not wait until disturbances reach dangerous proportions before responding." *Bennett*, 898 F.2d at 1533. Generally, correctional officers are authorized to use force when a prisoner "fails to obey an order. Officers are not required to convince every prisoner that their orders are

reasonable and well-thought out before resorting to force." *Pearson*, 665 F. App'x at 864 (internal citation omitted).

In applying the *Whitley* factors to this case, the Court recognizes at the outset that Plaintiff does not dispute his refusal of repeated orders by Officer Slay, who was pursuing him, to stop running away from the jail. Doc. 1 at 5–8, Doc. 23-3 at 3–4, Doc. 23-4 at 2–5. Rather, he admits that, while Officer Slay pursued him, "I got up and ran across the water to the other side of the creek. I ended up climbing over a fallen tree, trying to get away, but I was too tired to run, so I laid down and surrendered." He offers no specific details about how he allegedly surrendered, and he does not specifically state what he did with his hands. Doc. 1 at 5–6. Thus, the Court concludes that the need for force arose from Parker's failure to obey multiple orders from Officer Slay. *Pearson*, 665 F. App'x at 864.

With regard as to whether Plaintiff posed a threat and as to the reasonableness of the force used, it is undisputed that Plaintiff escaped from jail, refused repeated orders from Officer Slay to stop running, and, once he was on the ground, he kept his hands under him refusing to be cuffed. Doc. 23-4 at 2–5. Nowhere does Plaintiff dispute his refusal to follow orders or his refusal to allow his hands to be cuffed. Doc. 1 at 5–6. Thus, the Court concludes that the amount of force used by Officer Slay was justified by Plaintiff's repeated non-compliance with orders, his continued physical resistance, and the need to restore order. Accordingly, the Court concludes that the first four *Whitley* factors weigh against Plaintiff's claim of excessive force.

With respect to the fifth *Whitley* factor concerning the lack of serious injury, Plaintiff claims that, upon his return to St. Clair prison two days after the alleged assault,

"I was taken to the infirmary to get a body chart where I discovered, I had holes in my back from being tased repeatedly." Doc. 1 at 9. However, there is no evidence that Plaintiff complained to anyone at Elmore County Jail or St. Clair prison of specific pain or injury to his back from the alleged taser "holes." Plaintiff also claims that, after being placed in the padded cell at Elmore County Jail, he "was layed [sic] out on the floor breathing heavy and weesing [sic]. I began throwing up and I also blacked out a couple of times." Doc. 1 at 8. However, Plaintiff does not allege that he complained to any medical personnel about any injury resulting from these uncomfortable conditions. Furthermore, Sheriff Franklin stated that he was standing outside the Elmore County Jail when Parker was returned and that he "did not appear to have been injured in anyway. It was apparent that Mr. Parker was tired from running; however, our officers were also tired from pursuing Mr. Parker during his attempted escape." Doc. 23-1 at 3. Thus, Plaintiff fails to allege facts from which this Court could conclude that the alleged injuries and the pain resulting from them were serious. Accordingly, summary judgment is due to be granted on Plaintiff's excessive force claim.

### E.   UNCONSTITUTIONAL CONDITIONS

Only actions that deny inmates "the minimal civilized measure of life's necessities" are grave enough to establish constitutional violations. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). The Eighth Amendment proscribes conditions of confinement that involve the wanton and unnecessary infliction of pain. *Id*. at 346. Specifically, it is concerned with "deprivations of essential food, medical care, or sanitation" and "other conditions intolerable for prison confinement." *Id*. at 348 (citation omitted). Prison conditions that

may be "restrictive and even harsh, are part of the penalty that criminal offenders pay for their offenses against society" and, therefore, do not necessarily constitute cruel and unusual punishment within the meaning of the Eighth Amendment. *Id*. Conditions, however, may not be "barbarous" or contravene society's "evolving standards of decency." *Id*. at 345–46. Although "[t]he Constitution 'does not mandate comfortable prisons' . . . neither does it permit inhumane ones[.]" *Farmer*, 511 U.S. at 832 (quoting *Rhodes*, 452 U.S. at 349). Thus, a prisoner's conditions of confinement are subject to constitutional scrutiny. *Helling v. McKinney*, 509 U.S. 25 (1993).

A prison official has a duty under the Eight Amendment to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)); *Helling*, 509 U.S. at 31–32. For liability to attach, the challenged prison condition must be "extreme" and must pose "an unreasonable risk of serious damage to [the inmate's] future health." *Chandler*, 379 F.3d at 1289–90. As with deliberate indifference claims, to demonstrate an Eighth Amendment violation regarding conditions of confinement, a prisoner must satisfy both an objective and a subjective inquiry. *Farmer*, 511 U.S. at 834. The Court standard for establishing the objective and subjective elements of an Eighth Amendment claim is identified above.

The living conditions within a correctional facility constitute cruel and unusual punishment when the conditions involve or result in "wanton and unnecessary infliction of pain" or are "grossly disproportionate to the severity of the crime warranting

imprisonment." *Rhodes,* 452 U.S. at 347. "Conditions . . . alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities. Such conditions could be cruel and unusual under the contemporary standard of decency. . . . But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional." *Id.* In a case involving general conditions of confinement or a combination of conditions, a court should consider whether the claims together create conditions that fall below constitutional standards. *Hamm v. DeKalb Cty.*, 774 F.2d 1567 (11th Cir. 1985); *see Chandler v. Baird*, 926 F.2d 1057 (11th Cir. 1991).

The Court's consideration of the totality of a plaintiff's claims is limited by the Supreme Court's admonishment that "*[s]ome* conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need. . . . To say that some prison conditions may interact in this fashion is a far cry from saying that all prison conditions are a seamless web for Eighth Amendment purposes. Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Wilson v. Seiter,* 501 U.S. 294, 304–05 (1991) (emphasis in original).

As previously noted, a prison official may be held liable under the Eighth Amendment for acting with deliberate indifference to an inmate's health or safety when the official knows that the inmate faces "a substantial risk of serious harm" and disregards that risk by failing to take reasonable measures to abate it. *Farmer*, 511 U.S. at 828. "The known risk of injury must be a strong likelihood, rather than a mere possibility before [the

responsible official's] failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (internal citations and quotation marks omitted). Thus, mere negligence does not justify liability under § 1983. *Id.*

Plaintiff alleges that his constitutional rights were violated when he was placed for two days in a "padded cell" in handcuffs and shackles and he urinated on himself a couple of times "because there was no toilet, just a hole in the floor." He also alleges that he was denied a mat and a blanket and that a drunk prisoner was wrongfully placed in his cell with him on the second day. He further alleges that he "was in need of medical attention." Doc. 1 at 8. For the purposes of summary judgment, the Court must accept Plaintiff's allegations as evidence and will address his claims that these acts constituted deliberate indifference. *See Sears v. Roberts,* 922 F. 3d 1199, 1206 (11th Cir. 2019). Indeed, the Eleventh Circuit requires a court to "expressly consider[] the claims [of conditions and medical treatment] together." *Hamm*, 774 F.2d at 1576.

Plaintiff does not specifically state what medical attention he needed and was allegedly denied. Rather, he claims that, upon his return to St. Clair prison two days after his failed escape, he "was taken to the infirmary to get a body chart where it was discovered I had holes in my back from being tased repeatedly." Doc. 1 at 9. However, he does not allege that he complained to jail personnel specifically about back pain. Also, Plaintiff does not allege that he was deprived of a bed but, instead, that he was deprived of "a mat and a blanket." The Eleventh Circuit has specifically held that "temporarily ha[ving] to sleep upon a mattress on the floor or on a table is not necessarily a constitutional violation" in the prison context. *Hamm,* 774 F.2d at 1575. Indeed, Plaintiff might have been more

comfortable with a mat and a blanket. However, the Constitution does not require "comfortable prisons," and the Court concludes that these conditions do not rise to the level of being "inhumane." *See Farmer*, 511 U.S. at 832.

Parker further complains that there was "no toilet, just a hole in the floor," which resulted in his urinating on himself a couple of times. Doc. 1 at 8. He also states that "if it was a toilet it didn't matter because I had handcuffs behind my back and shackles on my feet . . . for two days until I went back to prison." *Id.* However, missing from these broadly stated allegations are any specific factual allegations that Parker was deprived of the ability to urinate or defecate for the two days he was in jail, and he makes no claims that he requested and was denied assistance to urinate or defecate during this time. *Id.*

When considering a plaintiff's Eighth Amendment claim for exposure to human waste, the "frequency and duration of the condition, as well as the measures employed to alleviate the condition, must be considered when analyzing the objective component." *Grimes v. Thomas*, No. 2:12-CV-01909-LSC, 2014 WL 554700, at *7 (N.D. Ala. Feb. 12, 2014) (citing *Hutto v. Finney*, 437 U.S. 678, 686–87 (1978). At most, Parker complains that for two days he was allowed to use only a hole in the ground as a toilet and that he was shackled and handcuffed, which required assistance from others. He does not allege that he was denied assistance in using the bathroom—only that he urinated on himself a couple of times in the process. Doc. 1 at 8.

Eighth Amendment violations "typically require the presence of intolerable conditions, far worse than those Plaintiff alleges." *Id.* at *7 (collecting cases); *see also Brooks v. Warden Powell*, 800 F.3d 1295, 1305 (11th Cir. 2015) (recognizing an Eighth

Amendment violation where a plaintiff alleged "he was denied the ability to use the bathroom or clean himself for a full two days" and "was 'forced to lie in direct and extended contact with this own feces without the ability to clean himself, while confined to a hospital bed in maximum security constraints'"); *McBride v. Deer*, 240 F.3d 1287, 1292 (10th Cir. 2001) (finding Eighth Amendment violation where inmate was forced to remain in a feces-covered cell for three days); *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001) (finding Eighth Amendment violation where, for thirty-six hours after a riot, the water overflowed to standing depth of four inches and prisoners urinated into the water where feces and uneaten food floated); *McCord v. Maggio*, 927 F.2d 844, 848 (5th Cir. 1991) (finding Eighth Amendment violation where prisoner was forced to live and sleep for two years in an unlit cell with sewage backup and roach infestation). Because Parker's allegations do not rise to the required level of intolerability, the Court concludes that his allegations fail to satisfy the objective element of an Eighth Amendment violation and that summary judgment is due to be granted on this claim. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014).

## V.    CONCLUSION

For the above reasons, it is ORDERED that Defendants' Motion to Dismiss and Motion for Summary Judgment (Doc. 23) is GRANTED and that this action is DISMISSED with prejudice.

A final judgment will be entered separately.

DONE this 10th day of November, 2020.


/s/ Kelly Fitzgerald Pate
KELLY FITZGERALD PATE
UNITED STATES MAGISTRATE JUDGE